in her official capacity as Attorney General of the United States, and William K. Markle III in his official capacity as Director of the Federal Bureau of Pregnancy Appellants. Mr. Hayes for the appellants, Ms. Levi for the appellees. Good morning, counsel. Mr. Hayes, please proceed when you're ready. Good morning, Your Honors. May it please the Court, Benjamin Hayes for the appellants. If I could, I'd like to reserve three minutes for rebuttal. The President issued Executive Order 14168 with the goal of protecting the dignity, well-being, and safety of women, including by ensuring that males do not invade the intimate single-sex spaces of women. The Constitution indisputably allows the Bureau of Prisons to house males with males and females with females, and nothing in the Eighth Amendment requires the government to treat these plaintiffs any differently than the 1,400 other plus trans-identifying men already housed in male facilities. That is especially true here, given the extensive efforts of the Bureau that the Bureau has taken applying its expertise in this area to minimize the risk of harm to plaintiffs in the facilities that have been designated for them. The Constitution requires nothing more. So if I could, I'd like to start with there are two threshold PLRA questions and then move to the merits. So of those two, there is the Judicial Review Bar, and then there's the Exhaustion Bar. The Judicial Review Bar says, notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court. From our perspective, that is categorical. It is all-encompassing, and it does not admit of any exceptions, including an exception for as-applied constitutional claims, which is what the district court held. And there are a number of court of appeals cases, the Willis case from the Tenth Circuit, for example, which agree with us on that. If you were to disagree with us on the Judicial Review Bar… Can I just ask you a question about that one first before you go to exhaustion? On that one, the bar speaks in terms of a designation of a place of imprisonment under this section. And what I'm wondering is, that means a designation of a place of imprisonment under the section that gives the BOP the obligation to designate a place. And so if the challenge is to something that comes before the BOP makes a designation, because as I understand this, it wasn't the BOP that came up with this rule. It was the Executive Order. The President came up with the rule by Executive Order. And, of course, that decision is implemented through the BOP. But does the bar apply in a circumstance in which the challenge isn't actually to the designation under this section in that it's a decision made by the BOP under this section? It's a decision that the BOP has to implement. It comes before the BOP exercises the discretion of the section. So it is, just as an initial matter, it's a little unclear with respect to exactly how plaintiffs are approaching this, because in the context of this issue, they want to say their challenge is against the fraud policy. In the context of the amendment claim, they would say, no, no, no, we're perfectly fine with that. Generally, it's just specific to us. So it's a little hard to get it. Let's assume for these purposes it's to the policy. Focus on this. Well, I think, first of all, there are designations right now. Those have been made. And so I do think it's somewhat artificial to say that the challenge would only be to the policy, even though we have right now designations in place. In one situation, you may be totally right about what the state of affairs now, but at least in one situation in the appendix, and I can try to find it, but there is a discussion of somebody as to whom no designation could have been made because it wasn't even clear to which facility they would be assigned. So I think for maybe two, and I think there was maybe two for whom there were designations put on hold. There's another one, I believe, who was in a halfway house, and so it's not going to be moved regardless. So just for purposes of focusing on that, I think it counts as a designation for this reason, because a challenge to the, in this case, it obviously would apply to a designation to a facility. We understand. We agree with that. But I think that the key here is that a challenge to the policy, the EO, and invalidating policy has the effect, is no different than a challenge to the designation. It would mean that they cannot go into effect. So that's different than the context in the McNary case, for example, that they cite. That case was talking about a background policy, which might influence a determination that didn't have to do with the BOP, but a determination as to an individual's eligibility for a program. And invalidating that policy didn't determine the underlying individual designation, didn't affect that at all. It could go one way or the other. Here, where they're challenging the policy, and if they prevail on that, that means these designations are invalid. So I don't think there's really the daylight that might otherwise exist in the context where there's a challenge to a policy, but there's individual designations. I don't think that's at play here. Wait, I'm not following that. You said McNary doesn't involve individual decisions? No, what I'm saying is McNary involved a, I think it was a pattern or practice challenge to a way that the INS was managing a particular program. There were individual eligibility decisions made, but the point there was that a challenge to the background policy didn't necessarily change the determination for the individual. The INS could have reached the exact same determination. It just meant you need to look at the individual and see if they're eligible without this background unlawful thing happening. I'm not sure that I'm following how that helps you. The background unlawful, what the court said in McNary was with the special agricultural workers, they could not get review of a determination respecting an application, and the Supreme Court held that that precluded review of individual decisions because of the language of it, but not a challenge to, quote, a group of decisions or a practice or procedure employed in making decisions, which to my mind sounds just like what the plaintiffs here are challenging. And your distinction of that is? So the reason I think it's different is because here, if they succeed on the challenge to the background policy, EO, that invalidates, necessarily invalidates the underlying designation. If it was, I would have to follow from it. That's not true in McNary, right? Well, it would invalidate the individual determinations to the extent that they rested on it, and then they could be remade, presumably. In McNary, the same ones could be. Here, not true. But that's either here nor there with respect to the applicability of the jurisdiction. Okay. Well, that was why I thought McNary was different. But if you disagree, we still, and I think the judicial review bar doesn't apply here, we still have the exhaustion bar that is written in the statute. This isn't – it's written in the statute. The Supreme Court has said that it is mandatory and doesn't have any extra textual exceptions. And that review bar, the Supreme Court has said, applies so long as there are administrative remedies that are available. And the court in Booth explained what availability means. But can I just ask you on this one? This is where I'm coming to on this, and you tell me what's wrong with thinking about it this way. It seems to me that whether the exhaustion bar has the dead end possibility, which means that then you don't have to exhaust it to the dead end if everybody agrees on that, right? Right. So it turns entirely on the way the substantive claim is framed. And so if the substantive claim is framed to say that there's nothing that could be done in a male facility that would alleviate the constitutional injury, there's just nothing, then it seems to me that exhaustion is by definition the dead end. Now, that has consequences for the substantive claim because then, as you raised with respect to the other bar too, the way you frame the substantive claim matters for the merits. But for purposes of exhaustion, if the substantive claim is, look, there's just nothing that can be done at a male facility to alleviate what I assert is my constitutional injury, then at that point it does seem like exhaustion by definition is a dead end. Even though you could say, well, there's things that could be done in a male facility that would, in our view, alleviate the injury. But if the claimant says, no, no, you don't understand. My claim is that by definition just being in a male facility is itself a constitutional injury. Then isn't exhaustion the dead end? I don't think so, Your Honor. And I don't think exhaustion requires that the administrative process be able to fully ameliorate the constitutional violation. That's what I take from Booth saying some relief. Booth says it doesn't matter if you can't get the exact relief. So the relief the plaintiffs here seek is halting these transfers, and that's the rationale of the district court. And the BOP certainly doesn't have discretion to do that. I think the difference is that – I understand what you're saying about Booth. I think the difference is it's true that that's the relief they seek, but it's also the claim that they're making, which is – that's what's different from Booth is that it doesn't alleviate – it's not just that it's not the relief we seek. It's that the claim we're making is that being in a male facility, period, is a constitutional violation. Now, you may respond and say, well, okay, well, that makes your constitutional claim on the merits tougher. And that may well be right, but in terms for exhaustion purposes, it just seems to me it's like the case that we had about DNA. If the claim in DNA were – in that case involving DNA were that I'm worried about what you might do with the DNA sample, then there could have been some exhaustion because it could have been, well, let's figure out what we're going to do with it. But the claim was you don't understand. It's a violation of my religion rights to take the DNA sample, period. At that point, there's just nothing that can be done with exhaustion, and it seems like that's what you're meaning. So I agree that that's the reason. I understand that was the case in that case. Here's why I think it's different, because regardless of how they're framing their claim, they're still bringing an Eighth Amendment claim, right, that has elements. That is a substantial risk of serious harm, which is objectively intolerable. So the question is, regardless of what their theory is about it and what they think will satisfy it or not, that's the claim. And so it's just a question of how much risk. And so that's why I think it is different, because there is something they can get from the administrative process which will reduce that risk. It may not be everything they want, but some relief doesn't require that. Not only that, but is it correct that each facility that houses whether men or women has to go through audits now on the prison rape statute? There are extensive procedures that they have to go through both when individuals are- when there are audit reports to come out with respect to the compliance of the particular prison or facility that has all kinds of- I've read some of these. I mean, all kinds of details about what is being done or what should be done and so on and so forth. And it would seem to me that the question of harm by being transferred may well depend on a number of factors, not the least of which is what the facility is that they're getting transferred to, what it's done with respect to that prison rape statute. So I agree with that. It depends on- We don't know. I can't find- maybe it's in the record, but do we know from this record what prison they were going to go to? Yes. We do? Yes. Do we know what crime they were imprisoned for? I believe as to one yes, as to the others, no. One of them- well, one said it was not a crime of violence. Right. I don't think the record reveals the crimes, but the record does show which male facilities each of the- with the exception of those who have been put on hold are destined for. So I think I said what I was going to say to that. Before you run out of time, I have a couple of questions I want to ask. The first is that I wonder whether yanking somebody out of the women's prison immediately is in compliance with the executive order. And here's why. The way I read it, if I can find it, is in section four, it says the attorney general and secretary shall ensure that males are not detained in women's prisons, etc., etc. But then in sub B of section 8, it says this order shall be implemented consistent with applicable law. The regulations are applicable law, and particularly 115.42 says that before you transfer anybody, you've got to go through a whole series of steps with respect to ensuring their safety. And from the record we see here, I don't see those steps have been made at all. It's just, you know, come with me, we're transferring. So how is the transfer consistent with applicable law? If it's not, then it's not consistent with the executive order. Well, so I believe in the – there were several declarations submitted by Mr. Stover in both the Jones and the Doe litigation, which identify that each one of these individuals was given a holistic assessment when it came to which facility to move them and which one to move them to. So there was a holistic assessment made as to each of them. Now, I don't know that – Yeah, I'll take a look at that. But before you sit down, let me put this on the table. I don't think we have jurisdiction in this case. And the reason is because the way the statute's worded, the preliminary injunction has to expire automatically within 90 days, unless it's converted to a final injunction. And so there's an opinion by Judge Chauflat, I don't know if you're familiar with it, the Georgia advocacy opinion, which goes through the statutory interpretation. It's a case that's identical to this case. And he holds for the 11th Circuit that they didn't have jurisdiction. Another way of framing it is that whether there's been compliance with a preliminary injunction and whether a preliminary injunction should be set aside is moot. The case is not moot because you can still go forward with respect to the merits due to a final injunction. But that's going to require, it seems to me, evidentiary hearings that clear up a lot of the questions that you've been answering about where the harm is and what prison it is and what offense they committed and so on and so forth. So as I understand it, and I'll let you respond, I understand that what Judge Lambert has done is right before the 90 days expire, he has another injunction, another 90 days, and another 90 days. I don't think you can do that under the statute. Maybe if the situation had changed, that would warrant a new injunction. But he made a specific finding that nothing had changed. And so he just reissued. And that seems to me in total defiance of the statute. So as I understand it, that is what is being done in the district court in terms of 90 days and then they are being renewed. And I do agree that it is simply just a renewal of the same thing, that nothing has changed. And I don't really, I haven't read that decision, so I really can't comment on it. Let me give you the citation if I can find it. Oh, here it is. It's for FedForth 1200. And it's a very extensive analysis of the statute we're dealing with here. Now, I should add that what happened after Judge Choflat ruled is that the parties got together, it was a transfer case, and settled the case. And so he vacated that opinion. I don't know if he could vacate opinions or vacate judgments, but he did. And you also, the government hasn't taken the position, before I understand. I don't believe that we have in the district court taken up that position. I mean, if that's a jurisdictional issue, we'll have to look at it. Correct. Can I ask you back on exhaustion? So, I sort of see this in two different ways. Like, the way that Ross talks about it is that in looking at Booth, you know, that you're only required to exhaust if the grievance procedure is capable of use to obtain some relief for the action complained of. And you and Chief Judge Srinivasan were talking about this just before. And here, the action the plaintiffs complain of is BOP's new approach of categorical transfers of all transgender women without regard to their individual characteristics, transferring them all to male facilities. And if that's what the plaintiffs are complaining of, then there is nothing that BOP can do. And I think BOP concedes this in its briefing. We can't decline to transfer these transgender women who are now in women's facilities. We have to. And so, if what you're complaining of as a matter of the Eighth Amendment is that decision, we're going to transfer them all, whatever their individual vulnerabilities may be. But then, as I read your brief, you say, well, the action complained of is a substantial risk of serious harm from that action, which is part of how they have to argue the Eighth Amendment violation. So even accepting that framing, then the Bureau says, well, there is some relief that can be given. And I'm not sure that what you point to, that I understand that to be some relief that would be a result of going through exhaustion. For example, it's mainly citing to one of the Stover declarations, and it points to things like general practices of the Bureau that aren't related to the grievance procedure, that aren't triggered by the grievance procedure, that aren't tailored to the individual as a result of the grievance procedure. It's like BOP has, commendably, programs for training staff, programs for tracking, disciplining, and potentially even prosecuting aggressors against other prisoners. That's there, whether somebody engages a grievance procedure or not. And then the one thing that I see that could be more specific is putting the victim in protective custody in a special housing unit. And there, another one of the Stover declarations talks about how that is not something that can be used for any extended period of time. It is a very, very restrictive kind of confinement. And so I just, there may be things, and I understand, I appreciate your reading of Booth as like, it doesn't have to be the full brass ring that the plaintiff wants, but if there are things that can come out of it, and Booth is very open-ended. And so there's value in process, there's value in exploring things, but I don't see the Bureau as pointing to a single thing that is actually responsive that can come out of it. I mean, I think this is, I do take your point about just reference to the PREA regulations. Yes, you have to do that screening, but that's not specific to, but here's what it is. The Bureau has, and each facility has, exceptional discretion when it comes to managing the populations in the facilities. So, for example, these are low security facilities, and I think there's different layouts as to how they're set up, but there are units, and if there's a particular inmate who is causing, who is a threat, for example, to another one, that can be noticed by the officers in the facility. It can be told to them by the potential victim, and if it's a problem, they can move that person to a different unit. If they're on the same work unit, for example, and there's trouble there, they can move them away. One of the, I believe some of the declarations discussed showering. In the regs, there is already in place a requirement that they have separate showers, so that's already there. But talking about locks on doors or something like that, I've not been, they have discretion to take those kinds of steps, which absolutely address the risk of harm. And I think maybe it doesn't bring it down to zero, but I think that if the risk of harm is 10, pre-use of the administrative grievance process, and they bring it down to seven, that's still some relief that is being given to the plaintiff. Maybe not all they want, but again, Booth says that's not what's required. Well, maybe those, I mean, I don't see those things fully spelled out as a result of exhaustion. I read pretty carefully the pages of the Stover declaration and record that were pointed to, but if BOP is not enabled, there is a question in the record whether it's consistently unwilling to do those things. For example, we do have evidence of two of the plaintiffs, I think it was Mary Doe and Jane Doe, who were assaulted in male BOP facilities. The BOP was made aware of that, and then they were assaulted again. So to the extent that there are these measures, the plaintiffs have put evidence in the record that they are not effectively being used. We don't have very much information about these plaintiffs being in male facilities, but to the extent that we do, it's not showing that BOP's awareness triggers, would render the exhaustion something that is worth doing. And then there's a whole other question about the time that it takes. Sure. You're going into, you're one of the, what is it, like 1% of the transgender women that are in BOP custody now that has, on an individualized basis, under the PREA regulation, not been placed in a male facility. These are presumably, and I understand your briefing saying it wasn't only based on vulnerability, that they weren't placed in male prisons, but surely that is a factor. And these people are not allowed to sue unless they go through an exhaustion process that has a standard duration of 90 days. Well, so if I could address that. So it is true that some of the plaintiffs in their declarations discuss assaults and such in male facilities. Now what we have here, a lot of it's unclear as to what male facilities, and it matters because you're talking medium security versus high security versus low security, the risk differential is quite different there. The two that you might have been referring to, I remember them being Rachel and Ellen, were temporarily moved from their female facilities to the male facilities and then back as a consequence of the injunction. And they did not, I don't remember exactly how many days they were there, they were not sexually assaulted there. I was talking about two other women who were assaulted in facilities and then again actually assaulted. I understand that Rachel and Ellen, but again, I mean, Ellen Doe said, you know, there's no locks on my door, I can't sleep. Well, and to your point about the length of the review process, and this is where the Fletcher case, the plaintiff's side is actually quite helpful, because Fletcher is from the Seventh Circuit, and so Judge Posner's decision. And, you know, Judge Posner goes through an analysis saying, well, it might be that there is a risk that is so imminent, like right on the doorstep, that no administrative process is swift enough to address essentially his point. But he said that the plaintiff in that case had to exhaust. Why? Because the Illinois Department of Corrections had an emergency grievance proceeding in it that would address claims more swiftly. The plaintiff waited two days, filed suit, and he said that's not enough. Here we do have in the regulations an emergency procedure grievance process that can be submitted to the warden and requires a response within three calendar days. So there are, and that's for situations where there is like an imminent risk to physical bodily harm, I'm paraphrasing the language. So my point is, there are accommodations or procedures that are not just in 90 days, which I agree, that doesn't address something that's very near term. But there are administrative procedures available to account for what Your Honor just mentioned in terms of near term issues. I'm going to cut you off. I just wonder if there's anything else in the record other than the portion of the Stover Declaration that's cited in your brief. I think it's the, your brief at 32 cites JA 308 to 310, which is the first Stover Declaration. It doesn't include anything other than what I view as sort of the background EOP policies or placement in special housing units. And I take it you don't see the placement of special housing unit as a kind of a durable solution. You're not going to have these women living in the special housing unit. It is a solution for a particularized issue. If there is something like someone said they were going to kill me now, and you could take that quickly, but short term. You wouldn't put the person who's going to kill you in the special housing unit rather than the potential victim. I actually don't know. You could at least put the victim there to keep them separate. I don't know actually whether they could do either one. I just don't have information. I mean, it's typically seen as somewhat punitive to be in solitary. Right, which is why I think the point was made subsequently that this is not a long term solution to it because it's not meant to do that. Yeah, that's your supplemental submission. Yeah. So I don't see individual, you know, something can be done under both. So I don't right now remember like a JA site to the kinds of things I just described in terms of just the ability of the facilities to manage the prison populations and keep people separate from one another, which they can do and they do on a regular basis. I believe, I don't remember which plaintiff's declaration mentioned this, there was recounts an incident where that plaintiff mentioned to a guard, I don't think it was at a prior facility, someone's causing a problem and they decide and they were able to separate them so that person wasn't housed near that plaintiff. That is exactly the kind of thing that can be achieved through the administrative process. I know I'm way over. I have one more question before you sit down. Do you view this case as a facial constitutional challenge to an executive order? Well, I think it partly depends on which part of the case you're talking about. So if focused on the Eighth Amendment arguments that they make, the plaintiffs make, their argument is that they are particularly unique. And so it is only unconstitutional as to them and that they are, and as far as I can tell, they are not taking the position that it is unconstitutional for all 1,400 other trans-identified men to be in male facilities. Now, we don't think, we don't agree with the premise of their position, but just to answer your question directly, I think it isn't. Their Eighth Amendment claim, if we're getting anything else, is phrased as an as-applied challenge. I know I'm way over time. Can you talk about the Eighth Amendment issue? The issue raising that is because whether it's global, everybody would, in their situation, regardless of which prison they're in, or whether it's just confined to the, how many are there, 22? There are 19 plaintiffs here. 19 plaintiffs in various facilities. Yes. The reason I'm asking that question is because it doesn't seem to be specific to their particular circumstances, even if you narrow the universe to the 19th. And if that's the case, it's a facial attack, and if it's a facial attack, under the Supreme Court's decision in Salerno, that you have to go through each one of these individuals to determine whether it would be unconstitutional to put them in a men's prison. You can't do it globally, because unless it's unconstitutional with respect to each one, then the court can't issue an injunction under the Salerno rule. So I absolutely agree with that. And so while I will say that they frame it as a challenge, we don't think that the features that they say make them distinct and unique from all 1,400 others stand. And they're not even features that are unique to all of them across the board. For example, some mentioned that they've had surgeries. That's, I think, a quarter of them have. All of them have had hormones, but that's true of other trans and anti-males in male prisons right now, which means that they are not the only ones also who have— But those strike me as— Objection to policy, because they're not being trans— Those are merits responses you have. And I don't know of a principle that says because that's true, it makes it a facial challenge. Maybe so. I was trying to get into the merits. I just want to make sure I understand where you are. The chief judge is absolutely correct. It is a merits thing. But you have to consider the merits if you issue a preliminary injunction, because one of the criteria is likelihood of success on the merits. Right. And that's what I'm— And it definitely goes to that. I guess all I'm trying to say is that I don't know that that would convert either a meritorious or unmeritorious as-applied challenge into a facial challenge. It's one that might make it a more difficult merits. Well, I guess my point is that the features that they try to point to to say, we are unique, do not hold up, which means that they are not distinguishable from all others who are in male prisons. And then the logical consequence of their argument at that point would have to be that the Eighth Amendment requires that 1,400 other trans and infant people be moved over to male prisons. They disclaim that. They say that's not right. Let's follow that, because they're the only ones who are being transferred. They're challenging a transfer policy. Right. They're challenging a transfer policy. So transferring women who are currently housed in women's facilities—I'm sorry, transgender women who are currently housed in women's facilities to men's facilities, all those other 1,500-odd are not being transferred because they're where the executive order wants them to be. They're not plaintiffs in the case. They're not affected. They're not affected by the district court's criminal injunction against transfer of transgender women from women's to men's facilities. I'm not suggesting that anything that happens here will have a direct effect on the other 1,400. I'm just talking about the logic of their argument. In other words, the other 1,400 could bring a claim that said, I should be transferred. Based on the logic of their argument, yes. So one of the arguments that they make, apart from substantial risk of harm based on being victimized, the district court made this point that independent of any harm from individual other inmates, they would experience a substantial risk of harm just by being in a male facility because it would increase their symptoms of gender dysphoria. That would be true as to every single other trans-identifying person in male facilities. The evidence they have is not unique to them. There's two declarations which are identical on this point. And it just says exactly what I just said. There's no differentiation between them and all 1,400 others who are in there. So that's the same point I'm trying to make. The upshot of which I think, as I understand your argument, is the upshot of that would be then somebody who suffers from gender dysphoria but is in a male prison could bring a constitutional claim of an entitlement to be transferred to a women's facility. Someone and all of them on that theory, yes. It's not individualized at all. Right. It's not individualized at all. The evidence they've submitted is not individualized at all on that question, certainly. So the district court ruled on constitutional grounds. But it seems to me that one of the really clearest violations on the merits that COP has on its hands is, I mean, even the executive order says, as Judge Randolph noted, that the executive order has to be carried out consistent with applicable law. And it particularly identifies and calls out in Section 4, you know, in ensuring that males are not detained in women's prisons or housed in women's detention centers, including through amendment as necessary of the PREA regulation, right? Part 115.41. That regulation has not been amended except that it's been effectively amended through BOP's series of actions here without going through notice and comment. I mean, do you have a merit response to that? Or is it just the jurisdiction stripping and exhaustion? Well, it is. Exhaustion doesn't do anything for that. Well, so it is also, well, there are a few things about the ABA claim. The first is, this is not a basis on which the district court ruled, as Your Honor just mentioned. And that is, you know, something that's important in most cases. Usually this court reviews and doesn't take up issues on its own. I think it's especially important here because this court held in the Shelley versus Sebelius case that we cite in our brief that in the context of a preliminary injunction, the court should not, not just it's not a matter of discretion, ought not to, should not reach out to affirm a preliminary injunction on the ground that was not embraced by the district court because granting of a preliminary injunction is a matter of discretion. So I don't think the court has the ability to do that anyway. And in addition, I think it would raise some significant issues with respect to the PLRA. Because that requires the district court to identify, to be, make findings that the particular injunction that is being issued is tailored to the injury that is being found. An Eighth Amendment injury is not an APA injury. They're very different things. So I think it would be very difficult to even reach the APA claim at this stage. In terms of the Shirley versus Sebelius, as I read that case together with subsequent decisions of our court and the practice of circuits nationwide, I have to understand Shirley versus Sebelius to advert to the fact that there were exercises of discretion by the district court that mattered in the ground that was being proposed as an alternative ground. We have, since then, the Inmate Federal Bureau of Prisons Execution Protocol case of 2020, where our court did consider an alternative theory and affirmed a preliminary injunction because it rested on purely legal arguments. And here, too, this argument about the failure to do notice and comment rulemaking to depart from the pre-regulation is a purely legal one. And so even though you're right that formally all injunctions are equitable, they're discretionary, I have to read our binding case law. How do you reconcile Federal Bureau of Prisons with Shirley versus Sebelius? And it's quite common nationwide that circuits where there's a purely legal issue that the Court of Appeals is in just as good of a position to address as the district court, that injunctions are frequently affirmed on alternative grounds. So if we – go ahead and address that if you want. The only thing I was going to say is I don't know that I'm familiar with the latter cases that Your Honor cited. What I thought was the case in Shirley was that it was also – the alternative ground was an APA ground. But I can't remember the exact specifics of it, but I thought it was an alternative ground. It's APA, but I think it depended on more fact-intensive issues, just a lot of different issues in the brain today. But in terms of on the merits, assuming that it were passed on by the district court or that Shirley versus Sebelius is not an obstacle, you were saying you didn't think that the plaintiffs would get relief from it? I'm not sure what you were arguing. The point about – I mean, this is the rule that says look for whether a placement for a transgender woman, consider whether to place them in a male or a female facility. I mean, that is the rule that they want to have still be in play, the plaintiffs. No, I didn't mean to say that. I think what I meant to say was because we're dealing with an injunction issued under the PLRA, there are special rules that apply to issuing injunctions under PLRA, which means the court, the district court, has to look at the particular harm that is found and whether the scope of the injunction and the nature of the injunction are appropriate for that and as narrow as possible. You're talking about the need narrowness. Exactly. I can't remember the exact subsection. I think that that analysis could very well be different if the harm – as between the harm being identified being an Eighth Amendment claim with a substantial risk of serious harm, et cetera, et cetera, versus an APA claim, which is go through notice and comment or their other theory being that different alternatives were not considered. I just think those are two very – at least could be two different things, which is a reason to let the district court do it. I see that as an abstract matter. I'm not sure I see how that would play out. For example, here, just because it's a little bit cleaner, consider the rulemaking. They're basically saying you have to abide by the pre-regulation unless and until it's been duly repealed through notice and comment. And the relief for that seems to me to be on all fours with the relief for the – to the extent that you think their Eighth Amendment claim is challenging the transfer of these trans women with their vulnerability to a male facility. That's the action complained of there. It seems to me pretty overlapping. That might be the way the district court would work it out. But do you have – I'm just interested concretely if you can sort of fill out where you think the district court might come out to some of this. I really don't know, honestly. I really don't know. But in addition to what we've just been discussing, I think, on the APA claims, there is also a review bar that applies to the APA claims, too. And I think in this context, some of the discussions that we were having about – I see I'm way over time. Some of the discussions we were having about a challenge to the policy versus a challenge to the designation sort of fall away. Because the policy here is the EO. You cannot bring a challenge, APA challenge, to the EO. And the plaintiffs, I think, acknowledge that. So the only other thing they could challenge is the designations. And that's what the APA review bar says. You cannot challenge. So this is much cleaner, certainly at least, than the initial bar that we were talking about before. And so the first thing that you would confront if you decided to move past all the things we've just been discussing would be a judicial review bar saying these are not questions that can be adjudicated. The district court didn't look at that either. The district court did not. It didn't agree with the APA claim. And because – and because I believe in one of the district court's orders, he said because they may well be barred. That was the reason given for – you know, the normal course would be to address a nonconstitutional argument. And so he addressed the Eighth Amendment because – out of – on the belief. And I think that's explicit in this decision. It's also explicit in some parallel litigation, the Kingdom litigation, where the same judge decided the APA claim and not the Eighth Amendment claim. So I think that is the reason. Well, and also because maybe the 3621 bar, he thought, didn't apply to constitutional claims. But that was his – that was part of his rationale in getting to the Eighth Amendment question. He relied on Webster v. Doe. Right, right. If your court has no further questions. We'll give you a little bit of time for – well, if you'd raise. Levi. Thank you, Your Honor. Good morning, Your Honor. Your Honors, may it please the court. Jennifer Levi, I represent the plaintiff appellees in these three consolidated cases. This case is about preventing the sexual violence that will be perpetrated against these 19 transgender women currently housed in women's facilities who will be transferred to men's prisons if the court vacates the injunctions below. Plaintiffs ask this court to affirm because it's the executive order that forces the Bureau of Prisons to disregard its own safety determinations and transfer these women to the very facilities that BOP previously deemed inappropriate for them. This isn't about some abstract questions, philosophical debates. This is about the constitutional limits on prison officials' ability to ignore known and serious violence risks. These women will face the same brutal reality that any woman would face if forced to live in prison among men. They will be sexually assaulted, raped, and violently attacked. And we know this because it's already happened to many of them. All of those previously housed in men's facilities have been repeatedly sexually threatened or violently assaulted and raped, some of them repeatedly. And when two of these individual plaintiffs were briefly transferred, they immediately faced sexual victimization. Can I just make sure that I understand the scope of your theory on the merits? You say in your briefing that you don't think that it's the case that every trans woman inmate needs to be, as a constitutional matter, in a women's facility. So the theory that you have can't cover everybody because you already said that it doesn't cover them. And so I guess my question is, what is it that ties together the particular 19 plaintiffs that gives them a constitutional entitlement that wouldn't then be over-inclusive in covering everyone, but also is not under-inclusive in the sense that it actually covers all 19? And the one thing I can see that does cover these 19 and nobody else is that they were all assigned to a women's facility. That's the one thing I see. But beyond that, and then we can talk about that, but beyond that, it seems like everything that's being asserted in the briefing either covers the population substantially more than the 19, or it doesn't cover all 19. Well, two things I want to say in response. One is certainly they're unique in that they have been designated as being appropriately housed in women's facilities. The other thing which is unique, which is that they are in women's facilities, and if they're transferred from women's facilities to men's facilities, they will be targeted because of being women. BOP is recognized as women, appropriately housed in the women's facility, being transferred to the men's facility. There's no doubt that what's going to happen when they arrive, as it happened to Rachel Doe, that they'll be seen and recognized as a woman, and many of them are indistinguishable from other women. So that's a significant step. I think that many of them. The assertion hasn't been – and I don't mean to quibble. Yeah, yeah. I honestly don't. It's just that I don't know – I saw in your brief that you say that six of the plaintiffs appear indistinguishable from other women, and there's no reason to doubt that. But that seems to suggest to me that it's not the same degree for the entire plaintiff's class. But you're right, of course, that being in the women's facility is definitely true of all 19 of them. If that's the criterion, then can I just ask, would that be true regardless of the reason that an inmate is assigned to a women's facility? That the mere fact of being transferred from a women's facility to a men's facility, regardless of why the inmate was in the women's facility, that would still be enough to state a constitutional claim? Well, as I said, it puts a target on them for sure, and it designates them in a different way than any other transgender woman in a men's facility would be seen or recognized by others in the facility. And so that is unique to this – Is that the theory, then, is that any trans woman who's in a women's facility is targeted upon transfer to a male facility? And at that point, that's all you need to know. Well, what I want to say is there could be circumstances, for example, for the broader question, if BOP were to wrongly designate someone for being housed in the women's prison. So it's not as if what defendants argue that there's no circumstances where there couldn't be because of an incorrect assignment or designation. But BOP has created a circumstance in placing someone in a women's facility that puts them at a unique and a different risk than anyone else that is a transgender woman in the men's facility. I did want to say defendants have not put any facts in the record to describe the 1,455 individuals that are housed in transgender women in the men's facility. And so what was in front of the district court was very specific facts about these individuals. And while not all of them have had genital surgeries, all of them have been on female hormones for an extended period of time. Female breasts, I mean, look like – They didn't testify. They submitted – Affidavits, right? There's extensive affidavits. Has there been any discovery? There hasn't been any discovery. Has there been anything that's gone on in terms of hearings, evidentiary hearings, between the time that Judge Lambert issued a preliminary injunction and the 90-day period expired? Did anything happen? There have been supplemental affidavits in the record, and there's been an opportunity for the – My question is, I'm looking toward whether there were any proceedings that were leading to converting the preliminary injunction into a permanent injunction, which would require, it seems to me, evidentiary hearings and some discovery. And my question is whether anything of that nature occurred during that 90-day period. There were no evidentiary hearings. Can you point me to where that Judge Lambert took into account the individual circumstances of the plaintiffs? I mean, yes, and we would go through the six orders, because the other point that I want to make is that the defendants create the perception that there was a uniform evaluation of each of these individual circumstances. And I'm happy to go through the individual orders, but this was a case initially filed in Doe by three individual plaintiffs, including evidence to support the allegations, opportunity for defendants to rebut it. There were then nine individuals that were added to the Doe case, and then an additional two that were transferred when those injunctions were enforced. The Jones case was initiated by an individual who has had genital surgery, was transferred from a low-security women's prison to a medium men's facility, where, I mean, she was immediately at risk and threatened. She was quickly transferred back. There were then four additional plaintiffs and additional evidence before Judge Lambert. So I can walk through those six orders, but Judge Lambert was pretty specific in each of them about the circumstances of Maria Moe, for example, and the additional plaintiffs in Doe that had experienced prior violent history in the men's facilities. In a way, to encapsulate his rationale in your perspective is that the district court took a look at the individual circumstances of each of the 19 plaintiffs and made an assessment that because of their individual circumstances, transferring them to a men's facility presented an unreasonable risk of physical harm. Yeah. That's the way you read what Judge Lambert said. In the six orders. And the defendants have had extensive opportunity to supplement the record. As Judge Clark pointed out, what they pointed to are generalized statistics that Judge Lambert specifically said were unconvincing because they don't look at the risk of violence that a transgender woman transferred from a facility into a men's facility would face. In fact, they don't look at, disaggregate at all, the risk to a transgender woman in those men's law security facilities. What they point to is really one statistic of sexual assault for men in those facilities over the past year, which disregards the facts that the district judge evaluated in terms of and identified in the multiple orders that he issued in terms of the Bureau's own statistics. As I said, in terms of the individual experiences of violence that either individuals face or the fact that, I mean, Maria Mo, as I said, the first Jones plaintiff, I'm sorry, Jane Jones. I mean, those, they were remitted to the women's facilities of Bureau of Prisons because the judges that evaluated the placement determined that they wouldn't be safe in the men's facility. So there was very extensive record evidence in front of Judge Lambert in making the determinations that he did. Am I understanding the theory correctly then that it may be for somewhat different reasons across the 19 individuals, but what they share in common is A, they were all assigned to a women's facility and were in a women's facility. And B, there are other considerations with respect to each of them that renders them particularly vulnerable if transferred to a male facility. The particular characteristics might be different across each of the 19 of them, but for one reason or another or some combination, each of them has characteristics that render them particularly vulnerable. And Judge Lambert focused on the individual characteristics across them to make the conclusion that each of them is vulnerable enough that they state that they have an Eighth Amendment violation. That's the way you understand the way you're defending it. Yes, Your Honor. And I would add to that, of course, that under the Prison Rape Elimination Act, the Bureau of Prisons has to do a review every six months. And so it's not just that they were, I mean, all of them were assigned there and the Bureau of Prisons and Judge Lambert does address this, has reviewed those and determined that these were the appropriate placements. And I say that because the defendants have raised that there are individuals who were placed in a women's prison because of a judicial order or because of a need for surgery. For example, that surgery, one of those surgeries has actually been performed. So then, again, you have a woman who's uniquely vulnerable from a women's facility to be transferred. So, yes, the district judge made that individual determination and also said that it's the required non-discretionary transfer that requires the Bureau of Prisons to ignore those individual safety risks. Was there any evidence introduced with respect to the reaction or distress of the women having biological men among them? There's no evidence of that in the record here. There's no evidence of the record. There is a case on that, though, isn't there? We had an intervention motion by, I think it was a woman prisoner who had litigated, and we denied the motion, but I think it was in Washington State or something. Are you familiar with that? I know that there was a motion to submit an amicus brief, and I reviewed it quickly because I understand it was just filed yesterday. I mean, many of the – Oh, that I don't know. Oh, I'm sorry, then. I thought that's what you were referring to. No, this was – Okay. But if I may, there is no evidence here that defendants have put into the record about any problems in those facilities. For exhaustion purposes, am I right in understanding that your theory is that – and this goes to the merits, too – but your theory is that there's nothing that can be done in a male facility that could prevent a constitutional injury? Well, that's correct, Your Honor. First, there's nothing that can be – there was nothing to exhaust because the defendants agree that the transfers are dictated by the executive order and that government lacks any discretion other than to transfer them. But, yes, based on the evidence that was in front of the district judge, there's nothing that can be done to keep these individuals safe. And as I said, that was demonstrated when two of these individuals were transferred. And I want to say that the record evidence that was submitted in response to that actually corroborated the allegation of the sexual threat that was faced by Rachel Doe. And what the response was that the BOP couldn't identify the perpetrator, which just suggests and really underscores the risk to them. To clear this up, at least in my mind, your argument is based on the transfer of a biological male to a male prison, right? From a female to a male prison. Yes, Your Honor. So, how does that affect intake? I mean, the regulation that's mentioned in the executive order is basically a regulation dealing with assessment of people that have just been convicted. So, how does your argument affect intake? There's a missing link there. I mean, your argument depends on having been housed in a woman's prison, but a new prisoner, and there must be new prisoners coming every day, every week. I mean, we've got, what is it, a million and a half prisoners in federal prisons and another two and a half million in state? This affects state prisons too. So, how does your argument affect intake? Well, as you pointed out earlier, the requirement under the PREA regulation that the executive order overturns would have required an individual assessment that considers either the placement in either facility. So, hypothetically, the assessment's done. They get placed in a woman's prison for one day, and now all your arguments click in. They have to be transferred immediately to a male prison. Well, no, Your Honor. As I was saying in response to the chief judge, if there's an error in the determination of placing someone in a woman's prison, then that would be a circumstance where there could be a different determination made if it's made consistent with the PREA factors. But if someone is put in a woman's prison because they are identified as being unable to be kept safe in a men's prison, then, as I said, it puts a target on them for sure if they're transferred to a men's facility because the BOP, assuming they've done the assessment correctly, has signaled, has said that they would be at risk in a men's facility. So it certainly creates a certain burden to demonstrate after making that determination that it's made safe. Can I ask you about one hypothetical situation? So suppose that the reason that an inmate is assigned to a women's facility is not that it's based on an assessment of dangerousness as such, but it's based on something like proximity to family for visitation purposes, and a judge makes a recommendation for that reason, and then the BOP takes that into account and says there's trans women in men's facilities, there's some trans women in women's facilities. In this particular case, it makes a special sense to put this person in the women's facility because of proximity to family for visitation purposes. In that situation, would the transfer under your theory of the constitutional violation, would it create an eighth amendment? Well, as you pointed out, that would go to the merits of the eighth amendment challenge, and if it ignored the increased risk that was put upon that individual because of having been in the women's facility, what would be constitutionally prohibited would be to ignore that safety risk and then just reflexively do what the executive order requires the Bureau of Prisons to do is to ignore the safety risk. And so that could create constitutional implications in that individual case. So you described the risk of these transferees showing up in a male prison. How do the other prisoners know where they're coming from, who they are? Presumably they give them different prison garb and they allow them to groom differently. I mean, I know there are things, but you were saying sort of apart from their individual characteristics, how they present the hormone treatment and other attributes of them personally, that the travel from facility A to facility B would, I think you said, put a target on them. I'm not sure I know enough about the information around these actions to appreciate that. Yeah, I mean, the reality is that there's a lot of information flow across the prison system, and that information will be quickly known. In these cases, actually, what happened was that the facility refused to provide broads, for example. And so it was obvious and apparent to everyone that these were individuals who had, well, this isn't in the record. I think it's obvious that their body is what their body is, not so much where they've come from. If you were a newly incarcerated person and you had the same garments issued to you with the same limitations, you'd be vulnerable for that reason as well now. Wait, I'm sorry, I want to make sure I understood your question. The last part of it, that you would be... If you were newly arrived, not transferred, you'd never been in a women's prison, but you're a trans woman with developed breasts and outside of the facility, you're used to wearing a bra, and you go in, they don't give you one. It doesn't seem to me that it's having been under the PREA regulation assigned to a women's facility that puts that target on your back. It's not exclusively that, for sure. And that is, you know, would... That any individual of other transgender women that applied would also be sexually victimized. Aren't there regulations dealing with that? I thought there were regulations, like they have to provide separate showers. Isn't that in the regulation? Yes, Your Honor. Yeah, so there are other ways in which they would be treated differently and designated. And I think I read that they have to, that the prison authorities in a male prison have to provide females who, or males who have had breast surgery with bras. I mean, this executive order over, purports to overturn the requirements, and I mean, in fact, people were denied when they were transferred bras. It doesn't deal with separate showers. No, I agree with that, Your Honor. I agree with that. I thought that part of the PI isn't being appealed by the government. It's not. It's not. Can I just follow up on Judge Pillard's hypothetical? So, in the situation in which a new inmate shows up in a male prison and presents as a woman, that could be because they're a new inmate. It could be because they're transferred from a women's facility. It could also be because they're transferred from a men's facility because they're transferred for other reasons. And so, in that context, the inmate could be in the male prison for any of those reasons. Is it, what's your view in that situation? Because I heard part of your answer that, well, they're in danger because of their female features. Yes, Your Honor. And that may well be true, but then if that were true, then why doesn't your theory then cover all trans women inmates who are in male facilities now, regardless of whether they came from or transferred from a women's facility? But then it seems like it would potentially cover the full sweep of the 1,448, whatever the number is, which is something that you're disclaiming your theory does. So, this case has been brought on these 19 individuals. The judge made factual findings on that basis. It may be that there are, I just want to say, of the 1,455 individuals who are facing Eighth Amendment violations, but it's not the executive order's requirement of them to be transferred that's applied to them. And so, the constitutional question associated with that doesn't apply to the individuals that are currently in the male facilities. So, your theory could, I guess, I just want to make sure I understand. Is it your position that your theory actually doesn't cover all 1,400 plus, or is it that all 1,400 plus aren't part of this case because they haven't been transferred? That's definitely true. And so, we just don't need to address them. I thought I took your brief to be taking the position that your theory actually doesn't cover all trans women who are in male facilities. Well, the district judge, in this case, evaluated each of these 19 individuals and applied the Eighth Amendment standard to make a determination that the Eighth Amendment standards apply to them. Among the factors that he would consider is the past history of the BOP designation and the predictable experience that they would face if transferred. And I guess, as you mentioned before, we don't have information on the characteristics of those 1,500-odd other trans women in BOP custody. There may be people who are very able to, forgive my nomenclature, to pass as men. They're trans women. They can come into a prison population and present themselves in a way that people would not mistake them for women or would not think they look highly feminized. And we just don't know. We don't know, Your Honor. We don't even know. We are also not disavowing the possibility that there may also be people who, under the PREA regulation, were assigned, trans women who were assigned to a male facility, and who may, in fact, be running into serious harm or risk of harm in that facility and may have, you know, PREA regulation or not, executive order or not, may have an Eighth Amendment claim. And then there's a question, you know, if they repeal the PREA reg, what's available to them? But that's not this case. Correct, Your Honor. Whose burden – this is going back to exhaustion and all these questions about, you know, depending on how you read the interaction between Ross and Booth, you know, if there's some relief that BOP can offer from the action complained of, whose burden is it to show that either there is no relief that BOP can offer or that there is some relief? Is it the plaintiff's burden to show no relief or is it BOP's burden to show there is some relief? Well, here there's no question that there's no relief. So there seems to be some dispute, at least at the level of the briefing. I'm not sure in the record. But, you know, let's say they had in the record said, we can give people door locks. We can put, you know, station guards near the area where they are housed. We can, you know, isolate people who are aggressors. There's a whole bunch of things that we can do. We do really quickly. We have emergency exhaustion. You need to exhaust. Let's say that is all true, but it isn't in the record. Whose fault is that? Is it the plaintiff's fault for not having excluded it or is it BOP's fault for not having said we can do all these things? I think it's on the defendants who haven't put evidence in the record to show that they can, you know, ensure that. And do you have any cases that would say with respect to the burden of that exhaustion under the development provision? Your Honor, I don't, but I would also urge this court to look at the amicus brief that was submitted by the law professors on the position regarding exhaustion, because there are multiple pathways in this case to address the exhaustion issue, including the fact that these individuals were told that they couldn't exhaust because BOP had no discretion other than to make the transfers, and because of the timing that prohibited them from getting any relief, including, you know, three of them at least having been immediately transferred. Yeah, that is a helpful brief on this. Can I ask you, do you have, I know this just came up in oral argument, but do you have at least an immediate reaction to follow up on Judge Randolph's question about the provision that says that a preliminary injunction can only be in place for 90 days? You know, my response to that is that what 3626 specifically contemplates is the renewal, anticipated renewal of an injunction in 90 days, and Judge Lambert, you know, tracks the requirement under 3626A2 that authorized the renewal in 90 days upon the court making the required findings around the PLRA factors. I'm not familiar with the case. We would ask for an opportunity to respond to it. The purpose of that provision, according to the committee reports, was to accelerate any lawsuit that dealt with prison conditions and rights of prisoners, because some of those cases were dragging out for years and years. And so the purpose is pretty clear. There's a Supreme Court case called Rufo v. Suffolk County, or something that you may know. And the provision says that once you put in a preliminary injunction, it can only last 90 days unless, et cetera, et cetera, it's converted to a final injunction. To say that this is just being renewed is, to my mind and to the 11th Circuit's mind, a complete refutation of the purpose and the language of the statute. I just have a hard time truing that with the language of 3626A2 that anticipates the renewal. A preliminary injunction shall expire unless automatic, unless what? Unless a final injunction is issued. Does it then make the order final? I mean, I understand. And I will say that the defendants have not even objected to two requests for renewals and renewal of those, along with the specific pillar. We're talking jurisdiction and probably mootness as well. It doesn't matter that they didn't object. I think there's a circuit split on it, but we can look into it. I was wondering if you had an immediate reaction to the subject of the case. Candidate just came up with her argument, so I'd appreciate it. Thank you. So you do just, I mean, I was pressing you on whose burden it is that you do cite Supreme Court's Jones v. Suffolk, which says this is an affirmative defense, which typically means it would be the defendant's burden. And certainly to raise it, but then there's some circuit law elsewhere, not in this case, that says, you know, when it's raised that there is exhaustion, then question whether it's impracticable. You know, circuits differ on how that's dispersed. So there is a statistic, and I guess I want to ask the government this too, but there's a statistic saying that the low security men's prisons where these plaintiffs would be proposed to be transferred are safer than the women's facilities. But I did notice, I don't know whether you raised this, but that includes assault by staff as well as by fellow inmates. So it would stand to reason that a trans woman going from a women's facility to a men's facility would probably face an increased risk that those statistics do not account for. Absolutely. Yeah, we agree with that. I wish my colleagues don't have additional questions. Thank you, Your Honors. Nothing further. Thank you. Mr. Hayes, we give you the three minutes you asked for for rebuttal. Thank you, Your Honors. Just a few points on rebuttal, just to hit some of the points that were raised here. So I think one of the points that was raised, starting with this idea that they're unique, the plaintiffs are unique because they are in a female facility, I think it's important to emphasize that there was no determination made, and there's nothing in the record to say that the reason any of these plaintiffs were in the female facilities is because the BOP made a determination that this is the only safe place that they can be housed. And the district court recognized that. He said in one of his opinions, it may well be there's a variety of circumstances, and that's true because it's a multileveled analysis. And so at this point, and the Stover Declaration say this explicitly, there is nothing to suggest, no evidence that safety was the determining factor or that the Bureau ever said determined that these plaintiffs could not be safely housed in male facilities. There was some discussion about the plaintiffs being uniquely susceptible to harm because of transfer. I am unaware of any evidence that supports the idea that mere transfer from a female facility to a male facility, as opposed to the other scenarios your honor mentioned, coming in initially from one male to another male facility, no evidence that I'm aware of to say that that puts them at any sort of increased risk of harm at all. There's some discussion about, I think... It's not in any, as far as you know, in any of the affidavits that there's a prospect of targeting because of a transfer from a women's facility. No, I'm not aware of that. So their affidavits don't address a lot of that address hormones, which is not an issue in this case. And the one that's on point, I do not believe mentions that whatsoever. When you say there's nothing in the record saying that they couldn't be safely housed in men's facilities, I thought you just said that. That they can't be safe. No, what I said is there's nothing in the record indicating that the Bureau determined that they had to be housed in female facilities to be safe. And so, yeah, okay, maybe I understand. Maybe what you said was the BOP did not make a determination that they could not be safely housed. That's correct. I guess that's different from saying there's nothing, because I think there's a lot in the record showing that they can't be safely housed in men's facilities. So, I mean, there's indeed declarations, there are history of sexual assault and rape in men's facilities, and the experience of the women who were briefly transferred from women's facilities to men's facilities and brought back is all. I mean, you can quibble with how powerful it is on the merits, but there is ample evidence that they have not been safely housed and they have been in men's facilities. Well, so I think what the relevant sort of level of analysis here isn't men's facilities generally, because that, of course, would include high security men's facility where murderers and rapists are housed, and that's a very different world. I think the relevant point that we need to look at is which facilities and the particular facilities that the Bureau has designated for them here, and that information is in the record. Still, the declarations lay it out, and there's a lengthy chart attached to it, the second declaration in the Jones litigation, which lays out statistics on guilty findings of assault generally, and then breaks it down based on sexual assault, which is lower level sexual assault or high level, and so on. And I think those statistics are very revealing. So each one of these facilities, first of all, is a low security facility, which means nonviolent offenders are housed there. So this is not where other violent individuals who would be more at risk of being perpetrators are housed. So that's point number one. On your point number one, in fact, isn't there a requirement that the Bureau of Prisons or the Attorney General submit a report to Congress every year with respect to rape and sexual harassment in federal prisons? I think there is. I trust you on that. And I ran the numbers, and the last numbers I saw were 2023, and at that time, it was about 1,500,000 federal prisoners, and the incidence of rape or sexual harassment was one half of 1% of the population. So one of the things I wondered about is you do, I think, repeatedly in your brief refer to, or maybe it's also in the declarations, refer to the facility, the target facilities, the low security men's facilities, you characterize as having lower incidence of assault or sexual assault than the women's facilities. And that surprised me. And so I looked into it a little bit more, and I think what may, I mean, in a society at large, the women are more victimized of sexual assault more frequently than men, and men are more frequently the perpetrators. So the notion that if you had a women's prison that people would be more frequently victimized by sexual assault surprised me. But the figures include victimization by staff, and that makes me think that if you put a woman in a male, a transgender woman in a male facility, she may not have reason to take much comfort from the relatively low rates of assault there. So the information I'm aware of that was attached in the Stover declarations, I don't know if you're referring to that Bureau of Justice statistics report. I'm referring now to the data specific to these facilities, which I was a little surprised to have us be criticized for referring to a generalized data. That report is the only basis on which the district court relied, the only basis. So anything that plaintiffs may say against that report in terms of the statistics not being disaggregated and so on is a problem for them. It's their burden, not a problem for us, because what we rely on is the information that Mr. Stover submitted, which lays out the guilty findings of assault for the facilities in which the plaintiffs are currently in compared to the ones in which they have been designated for. And they are lower. The only thing is, we don't know the most salient thing, which is how do the low security men's facilities deal with transgender women being there? And it just stands to reason, and especially since there's past experience of some of these women, including in low security men's facilities, being victimized. So I disagree with that, because every single one of these facilities to which plaintiffs have been designated currently have trans-identifying men in them. So these rates, which are- We don't have that information. We don't have that broken down. I don't- How many? How many? Where? No, I think we do. I mean, so we have- I don't know if I can specify certain facilities, because some of that might be under seal. Right. But for- But we do have information of, in a low security men's prison, how many of the residents there are trans women. This is in the Stover declarations. Yes. And so I think that's important because, number one, and to your point, it shows that looking at the very low rates in these prisons of sexual assault, that's not because they don't have this particularly vulnerable population in them. It's despite of the fact that they do. Right? And then you have, one, guilty finding of assault across all seven prisons in 2024, and that's not an anomaly at all. From 2020 to 2021, zero. I think 2022 had one in one facility, and then so on. Those are the numbers. And it's just very hard for me to say, to think that that can rise to a level of objective risk of serious harm when those are the numbers. And it also goes to show that these are facilities that are well aware of how to manage prison populations that have trans identifying people in them, and therefore they are accustomed to knowing what issues might arise and how to address them. I see my time has expired. Thank you, Your Honor. My colleagues don't have additional questions. Do you have anything about the burden not being on the BOP to show that there is some relief that exhaustion could provide? It's clearly on the BOP to raise exhaustion as an affirmative defense. Once you've said, look, we have an exhaustion process, to the extent that there's dispute about whether there's any partial relief that can be provided through that, is it your burden to establish that there is some relief, or is it the plaintiff's burden to negate that there might be some relief? I don't know the details of that. I do know that it's an affirmative defense, but beyond that, I'm not sure how this court or others have worked it out. I don't think we have anything directly on point. Okay. I haven't seen a case that addresses that. All right. If you would like, we can submit a 28-J on that question. We can also submit a 28-J on the 11th Circuit jurisdictional question, if you so direct. Thank you. Thank you, counsel. Thank you to both counsels. If that's helpful, you might as well go ahead and submit it. You said if we so direct. On both of those? Yeah. Sure. Thank you, counsel. And if we want a supplemental briefing, we'll issue something on that. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Pillard; Randolph